UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSICA GILBERT, et al., | No. 2:22-cv-02091-MCE-KJN |
| Plaintiffs, | |
| v. | **MEMORANDUM AND ORDER** |
| SACRAMENTO SELF HELP HOUSING, et al., | |
| Defendants. | |

By way of this action, Plaintiffs Jessica Gilbert ("Gilbert") and Sacramento Homeless Union ("Union") allege that Defendants Sacramento Self Help Housing ("SSHH"); John Foley, in his official capacity as Executive Director of SSHH; Jeremy Baird, in his official capacity as Director of Interim Housing for SSHH; County of Sacramento ("County"); and Sacramento County Department of Human Assistance ("DHA") participated in evicting Gilbert from her shelter housing in violation of her due process rights.  Plaintiffs allege causes of action for: (1) violation of the Right to Substantive Due Process (State Created Danger) under the Fourteenth Amendment to the United States Constitution and Article I, Section 7, of the California Constitution; (2) Discrimination Based on Sex and Familial Status (Pregnancy), Hostile Environment Harassment under the California Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code §§ 12955, et seq., Cal. Code Reg. Tit. 2, § 12120(a)(2); (3) Discrimination and

Harassment Based on Sex and Familial Status (Pregnancy) in violation of Cal. Gov't Code § 11135; (4) violation of the Right to Due Process of Law under Article I, Section 7 of the California Constitution; (5) violation of the Right to Free Speech and Petition the Government for Redress of Grievances under the First Amendment to the United States Constitution; and (6) violation of the Right to Pursue and Obtain Safety under Article I, Section I of the California Constitution.  Presently before the Court is Plaintiffs' Amended Motion for Temporary Restraining Order seeking primarily "a mandatory injunction directing Defendant SSHH to rescind the 'Immediate Exit Notice' issued to Plaintiff Jessica Gilbert and permit her to immediately return to and inhabit her former residence or other comparable housing operated by SSHH." ECF No. 6 at 11.  Having considered the record in its entirety, the applicable case law, and the arguments set forth by counsel at the hearing before the Court on November 30, 2022, that Motion is hereby DENIED.[1]

## BACKGROUND[2]

Gilbert is a homeless woman who is currently approximately seven months pregnant.  Decl. of Jessica Gilbert, ECF No. 6-1, ¶ 2.  She also suffers from "a number of disabilities including post-traumatic stress and depression." Id. ¶ 3.

On or about September 6, 2022, Gilbert and her partner, who is also the father of her unborn baby, were accepted for temporary placement into an SSHH shelter.  Gilbert signed an Interim Housing Program Participant Agreement stating, among other things:

> I . . . understand that I am being assigned a bed at a house operated by Sacramento Self-Help Housing.  I understand that I may occupy the bed only for as long as I am a participant in

---

[1] This written order supersedes the order the Court set forth on the record at the hearing on November 30, 2022.

[2] The Court recounts the facts to the best of its ability on this limited record.  It became clear at oral argument that more facts may potentially be disputed than it appears from the papers, further undermining the propriety of issuing any mandatory relief.  Given the flimsy nature of the current record, none of the factual assertions stated herein should be construed as binding factual findings.

> the program. I understand that I will not pay any program fees or rent while staying here, and that this is not permanent housing or rental housing; I am considered a guest in this house, and there is no guarantee of permanent housing at the conclusion of the program.
>
> I understand that I will not receive any keys to this house, and I am not allowed to change or install any locks, nor am I allowed to use the address as a mailing address. Any mail that may arrive at this house addressed to me will be returned to sender.
>
> I understand that I am expected to be an active participant in the program, which includes setting goals and completing tasks.
>
> I further understand that failure to follow the rules of the house may result in the loss of my bed, and I could be discharged from the Interim Housing program. In addition, if I leave the house for more than 3 days in a row, I may lose my bed and be discharged from the program.

ECF No. 9, Ex. 1. That same day Gilbert signed an Interim Housing Program Exit Agreement, by which she acknowledged the following:

> I understand that my stay as a guest in this house is for a short-term period, and that I am not a tenant and have no legal right to claim a tenancy. I pay no rent, I have no key to the premises, and I am not permitted to use this property as a mailing address. My personal property is my responsibility.
>
> My residency may be terminated immediately for violation of the Interim Housing Program Participant Agreement, the House Rules, or any program participation requirements related to my residency, or when Sacramento Self-Help Housing determines that my residency period has exceeded my need to remain here. Upon receiving notice of termination of my residency, I agree to leave and take my personal belongings within the time period required by the House Leader or other Sacramento Self-Help Housing employee, without causing any disturbance within the house.

Id., Ex. 2.

Within the first few days of entering the SSHH program, Gilbert was apparently bounced around to different houses, but her case manager assured her it was not because she had done anything wrong. The actual location of each house in which she resided is not relevant, however, because her participation in the SSHH program is the

3

umbrella that covers all residencies.

According to Plaintiffs, Gilbert was thereafter targeted by staff member Shawn Goodrich, who was hostile and impatient with Gilbert allegedly because of her pregnancy.  According to Gilbert, "Goodrich began to harass [her] with alleged 'House Rules Violation Notices' including four consecutive notices dated September 8, 9, 10, and 11, 2022 in which he alleged 'Missed Curfew.'"  Gilbert Decl., ECF No. 6-1, ¶ 7.[3] Gilbert does not dispute that she missed curfew, but avers instead that "[o]n each occasion where [she] was cited for 'Missed Curfew,' [she] was late only by a few minutes." Id. ¶ 8.  She then explains that "on one occasion [she] was actually in the emergency room at Kaiser Hospital due to a pregnancy-related issue and [she] texted [her] case manager to let her know where [she] was." Id.  On one of the other days, she purportedly went to an In-N-Out restaurant where she encountered a long wait for food, so she notified SSHH she was running late.  Id.[4]

Gilbert contends that Goodrich thereafter "backed off" of writing her up, but then cited her six more times between October 7 and October 17, 2022.  Id., ¶ 10, Ex. G. Again, however, Plaintiff admits that she did not follow SSHH rules.  Plaintiff states that "[t]hree of the notices cited [her] for 'not [keeping] up with house/personal chores' although [Plaintiff] had told [Goodrich] and he knew that due to [her] pregnancy it was

---

[3] Plaintiffs provided copies of consecutive write ups for missing curfew, but the County Defendants provided an additional write up from September 10 charging Gilbert with "Harassment of others/inappropriate behavior" for purportedly "not following rules and being disruptive."  ECF No. 9, Ex. 3. In addition, notes from the House Monitor, Michelle Blanks, indicate that during this September time frame she determined Gilbert and her partner were smoking cigarettes in their room, Gilbert was refusing to follow house rules regarding storing personal items in rooms as opposed to common areas, and Gilbert was pushing back on the House Monitor's authority to enforce house rules.  Id., Ex. 4.  The Court, however, disregarded any reference in Defendants' papers to findings of weapons or drug paraphernalia because the record is devoid of evidence of any such violations.

[4] For instant purposes, the Court can assume the justifications for her tardiness are true, but it is worth noting that the only evidence presented to the Court to support Gilbert's arguments are her own self-serving statements and a copy of a text message string regarding the In-N-Out drive through.  She did not proffer text messages regarding the emergency room visit or documentation from either the emergency room or the restaurant.  Gilbert also later referenced in an unrelated written grievance filed with SSHH that she was in the emergency room on October 12, 2022, rather than back in September so the actual chain of events is unclear.  Id., Ex. N.

4

hard to do [her] chores and it was taking [her] a little longer than usual." Id. ¶ 9. Based on this statement, Gilbert seems to concede that she was not meeting the chore requirements, although she does try to argue otherwise, declaring that she provided Goodrich and SSHH staff with photos and videos of herself cleaning bathrooms and common areas. Gilbert's write-ups can nonetheless be reconciled with her photographic and text evidence because although Gilbert texted her case manager to advise that she cleaned the bathroom, she admitted it was "not even [her] chore." Id., Ex. F. Gilbert does not mention whether or how she performed her assigned tasks. Finally, during this time period, Goodrich also cited Gilbert for "harassment of others/inappropriate behavior," but Gilbert appears to contend this is inaccurate because she was actually only "arguing with [her partner]." Id. ¶ 10.

On October 12, 2022, Gilbert was issued a "14 Day Exit Notice" that required her to vacate the premises within 14 days due to her rules violations. Id. ¶ 11, Ex. H. The Notice advised that "continued rule violation [would] result in an IMMEDIATE exit from the shelter house." Id. According to Gilbert's case manager's notes, he met with her on October 25, 2022, and advised her that he was rescinding the 14-day eviction notice, but that she was under a contract so another write up would result in an immediate exit. ECF No. 9, Ex. 6. It appears that on October 27, 2022, Gilbert was also given a Rule Violation Contract, constituting a "final notice" for all rule violations. Id., Ex. 7.[5] Not long after, on November 3, 2022, Gilbert was given an "Immediate Exit Notice" requiring Plaintiff to leave immediately and explaining as follows:

> Clients continue to violate program rules. Back and front doors were left unlocked by clients after hours to let their cat out & remained unlocked (safety concern for entire shelter). Clients continue to argue and disturb the shelter house. Clients continue to not have cat on the leash while letting the cat out (violation of pet policy). Also, reported clients taking others food and still spending a long time in the restroom. We rescinded original 14-day notice and any violation of the program rules would result in an immediate exit.

---

[5] Gilbert did not sign this notice, but it does not appear disputed that she received it, even if she declined to sign it.

Gilbert Decl., ECF No. 6-1, Ex. I.  Gilbert texted her case manager and a person purportedly named Melody, who identified as a "case manager II," replied advising that DHA had approved Gilbert's exit.  Id., Ex. J.

Gilbert takes issue with the Immediate Eviction Notice for the following reasons:

> The Immediate Eviction Notice does not identify or even assert the existence of any witnesses to the alleged rules violations and even though the previous 14-day Notice was rescinded, the Immediate Exit Notice nevertheless refers to "clients" who "continue to violate program rules."  To the extent that any alleged violation specifically identified [Gilbert] as opposed to "clients," [she] was given no opportunity to use the SSHH Grievance Procedure or appeal the decision before [she] was ordered out under the threat of police arrest.

Id., ¶ 14.  According to Gilbert, had she been given the opportunity to respond she would have proffered the following:

> [She] had to spend a lot of time in the bathroom because [she is] pregnant and needed to relieve [herself] very frequently, take baths to ease the pain in [her] back which has increased as [she] get[s] closer to [her] due date, deal with sickness and other effects of pregnancy and simply because it takes [her] longer in the bathroom for all personal and hygiene tasks than it does if [she] were not pregnant;
>
> [I]t is very difficult and painful to have to bend down to attach and remove the cat's leash;[6]
>
> [I]t is not unusual for there to be irritability and have arguments when one is pregnant.

Id. ¶¶ 15-18.  With more time, Gilbert also contends she could have utilized the SSHH grievance procedure to confront evidence and witnesses against her.[7]  Instead, Gilbert avers, she was left with nowhere to go until the Union provided funds to place her in a motel, which is where she has been residing.  The Union purportedly ran out of funds,

---

[6] Gilbert purportedly had to push to be permitted to keep the kitten, which is an emotional support animal, with her in the first place.  After Gilbert provided medical documentation regarding her need for the cat and the Union contacted SSHH, she was permitted to keep the animal. The Immediate Exit Notice is purportedly the only other time the kitten was mentioned as support for a rules violation.

[7] Plaintiffs do not explain why Gilbert could not have filed grievances as to her rules violations when they occurred instead of waiting to grieve only her eviction.

however, and at the time of the hearing, Gilbert provided a declaration indicating she is living on the street in a tent.

## STANDARD

The purpose of a temporary restraining order is to preserve the status quo pending the complete briefing and thorough consideration contemplated by full proceedings pursuant to a preliminary injunction. See Granny Goose Foods, Inc. v. Teamsters, 415 U.S. 423, 438-39 (1974) (temporary restraining orders "should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer"); see also Reno Air Racing Ass'n., Inc. v. McCord, 452 F.3d 1126, 1131 (9th Cir. 2006); Dunn v. Cate, No. CIV 08-873-NVW, 2010 WL 1558562, at *1 (E.D. Cal. April 19, 2010).

Issuance of a temporary restraining order, as a form of preliminary injunctive relief, is an extraordinary remedy, and Plaintiffs have the burden of proving the propriety of such a remedy. See Mazurek v. Armstrong, 520 U.S. 968, 972 (1997). In general, the showing required for a temporary restraining order and a preliminary injunction are the same. Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc., 240 F.3d 832, 839 n.7 (9th Cir. 2001).

A plaintiff seeking a preliminary injunction must establish that he is (1) "likely to succeed on the merits;" (2) "likely to suffer irreparable harm in the absence of preliminary relief;" (3) "the balance of equities tips in his favor;" and (4) "an injunction is in the public interest." Winter v. Natural Res. Defense Council, 555 U.S. 7, 20 (2008). "If a plaintiff fails to meet its burden on any of the four requirements for injunctive relief, its request must be denied." Sierra Forest Legacy v. Rey, 691 F. Supp. 2d 1204, 1207 (E.D. Cal. 2010) (citing Winter, 555 U.S. at 22). "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" Winter, 555 U.S. at 24 (quoting Amoco Prod. Co. v. Gambell,

480 U.S. 531, 542 (1987)).  A district court should enter a preliminary injunction only "upon a clear showing that the plaintiff is entitled to such relief."  Winter, 555 U.S. at 22 (citing Mazurek, 520 U.S. at 972).

Alternatively, under the so-called sliding scale approach, as long as the plaintiff demonstrates the requisite likelihood of irreparable harm and shows that an injunction is in the public interest, a preliminary injunction can still issue so long as serious questions going to the merits are raised and the balance of hardships tips sharply in the plaintiffs' favor.  Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (concluding that the "serious questions" version of the sliding scale test for preliminary injunctions remains viable after Winter).

## ANALYSIS

The Court's disposition of the instant Motion is driven by the limits of Plaintiffs' request.  Plaintiffs are before this Court seeking a temporary restraining order—an order that by definition is intended to preserve the status quo.  The status quo, however, is that Gilbert has been evicted from the program.  What Plaintiffs actually seek then, is a mandatory injunction directing that Gilbert be moved back in.  That relief on the current posture would be inappropriate for a number of reasons.

First, Plaintiffs are seeking extraordinary mandatory injunctive relief on a truncated temporary restraining order timeframe.  Gilbert was given her immediate exit notice on November 3, 2022, but did not involve this Court until she filed her Complaint on November 18.  She then waited an additional three days, until the Monday of Thanksgiving week, to file her initial request for emergency relief.  Had Plaintiff initiated this action immediately upon her eviction, it would have permitted the parties time to fully brief the issues and the Court time to evaluate the facts on a developed record.  Instead, the parties rushed to brief Plaintiffs' motion over a holiday weekend, providing the Court with some evidence, but not nearly enough to evaluate the merits of Plaintiffs' claims.

Second, from the papers it appears undisputed that Gilbert broke a number of SSHH rules, rules she agreed to abide by when she entered temporary housing. She missed curfew on multiple occasions, appears to have fallen short on completing her chores, was disruptive and purportedly did not lock doors. At oral argument, however, counsel argued alternatively that Gilbert did not break the rules, that her infractions were minor, or that Defendants' enforcement of the rules was pretextual. The problem with these arguments is that Gilbert admitted she broke a number of rules, there is no evidence that minor infractions are insufficient to justify eviction from the SSHH program, and there is even less evidence that Plaintiffs' write-ups were pretextual. Although counsel believes Defendants targeted Gilbert because of her pregnancy, Plaintiffs have articulated no objective basis for such animus. Indeed, the Court is hard pressed to conceive of why a non-profit organization with the goal of providing temporary housing to homeless individuals would want to evict a pregnant woman before the holidays. Bare assertions will not carry the day here. Given this, Plaintiffs have failed to identify serious questions going to the merits of their claims, let alone a likelihood of success on their claims.[8]

Third, it is unclear whether Gilberts' eviction caused irreparable harm or if the harm was caused because the Union ran out of funds to pay for Gilbert's hotel. When Gilbert was evicted, she was not forced back onto the street because she had alternate housing. Even if she had not been provided with housing, however, it is unclear whether she suffered from irreparable harm, since she was returned to the same status she occupied prior to entering the SSHH program—that is, Gilbert was homeless before she entered the shelter and homeless when she left. Plaintiffs have not shown that this rises

---

[8] Nor is the Court persuaded that Defendants should have declined to immediately evict Gilbert to allow her to pursue the grievance process. Gilbert was in SSHH housing for almost two months. She was purportedly given multiple write-ups, a 14-day eviction notice, and eventually notice that further violations would result in immediate eviction. At any point during this timeframe, she could have invoked the grievance process, but she chose not to. To allow her to invoke the grievance process now and demand that Defendants take her back in during its progression would undermine the entire functionality of the emergency shelter's operations because there would be no certainty as to when individuals could or could not be removed from the program.

to the level of "irreparable harm" necessary to justify granting injunctive relief. To be sure, a contrary conclusion could lead shelter operators to believe they cannot evict individuals who lack arrangements for alternate housing without running the risk of being held liable for inflicting irreparable harm on such constituents.[9]

Finally, as much as the Court feels for Gilbert's current predicament, the balance of hardships and the public interest favor denying her Motion. The record is unclear as to whether Gilbert qualifies for entry into the SSHH program at this point or where SSHH would put her. There is evidence in the record that indicates Gilbert is no longer receiving county services and thus could not be accepted into SSHH housing without putting SSHH in breach of their agreement with the County. There is also evidence that all of SSHH's beds are occupied by homeless individuals who are abiding by program rules. To create a bed for Gilbert, one of those individuals would have to be evicted. The hardships to Defendants and third parties created by going down these paths thus outweigh the alleged injuries to Plaintiffs.

Given all of the foregoing, it would be wholly inappropriate for the Court to grant Plaintiffs the extraordinary relief requested. While the Court is certainly sympathetic to Gilbert's circumstances, it cannot allow that sympathy to dictate the outcome of this case. In light of the very limited and disputed facts before the Court, and Plaintiffs' heavy burden to justify injunctive relief, the Court is compelled to deny Plaintiffs' Motion.

///
///
///
///
///

---

[9] For the same reason, Plaintiffs have also not adequately shown that her eviction qualifies as a state created danger. Since Gilbert's eviction resulted in her being returned to the same position she occupied prior to Defendants' intervention, any governmental action is arguably irrelevant. If she was not irreparably harmed, then the government also cannot be charged with having created a danger. Very similarly, the responsibility for Gilbert's homelessness cannot be left at the government's door if the eviction was the result of Gilbert's breach of her agreement with SSHH as opposed to some sort of wrongful government action.

**CONCLUSION**

For the reasons just stated, Plaintiffs' Amended Motion for Temporary Restraining Order (ECF No. 6) is DENIED.

IT IS SO ORDERED.

DATED: December 20, 2022

MORRISON C. ENGLAND, JR.
SENIOR UNITED STATES DISTRICT JUDGE